***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Homick and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Homick and enters the following Opinion and Award:
 *********** EVIDENTIARY MATTERS
Plaintiff filed a Motion to Take Additional Evidence before the Full Commission on February 28, 2011. Defendants objected to Plaintiff's motion. Plaintiff's Motion is DENIED.
 *********** *Page 2 
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to joinder or nonjoinder of parties.
4. An employment relationship existed between Plaintiff and Defendant-Employer on February 6, 2009.
5. Specialty Risk Services was the carrier on the risk on February 6, 2009.
6. The date of the alleged contra/ctual occupational disease and/or injury is February 6, 2009.
7. At the time of Plaintiff's injury, his average weekly wage was $613.90, with a corresponding compensation rate of $409.27.
 ***********
The following were submitted to the Deputy Commissioner as:
 EXHIBITS
1. Stipulated Exhibit #1: Pre-Trial Agreement.
2. Stipulated Exhibit #2: Industrial Commission Forms, Filings, and Plaintiff's Medical Records (Pages 1-67).
 *********** *Page 3 
As set forth in the Pre-Trial Agreement and Deputy Commissioner Homick's January 7, 2011 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether Plaintiff sustained a compensable injury and/or occupational disease to his right upper extremity? If so, what are the compensable consequences?
2. Whether Defendants have terminated Plaintiff's employment in bad faith after he sustained a compensable injury and /or occupational disease? Or in the alternative, whether Defendants have refused to offer light duty employment to Plaintiff following his injury?
3. Whether Plaintiff sustained any permanent impairment as a result? If so, to what extent?
4. Whether Defendants have defended this claim in violation of N.C. Gen. Stat. § 97-88.1? If so, what sanctions are appropriate?
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 62 years old. Plaintiff commenced employment with Defendant-Employer on February 5, 1997, initially as a grill cook and then as a manager in the Facilities Department.
2. On May 18, 2005, Plaintiff sustained an admittedly compensable injury to his right shoulder when he fell at work while demonstrating the procedure to strip a floor. Dr. Michael E. King, an orthopedic surgeon, repaired Plaintiff right shoulder and assigned a 15% permanent partial disability rating to Plaintiff's right arm as a result of that injury, which Defendants paid. *Page 4 
3. When Dr. King subsequently released Plaintiff to return to full duty work, he returned to Defendant-Employer in his supervisory position. Dr. King testified that his instructions to Plaintiff after the surgery were to return to a clerical or managerial position and not perform repetitive work or any type of heavy labor with the right shoulder, as the quality of the tissue of the rotator cuff was in poor condition and could be reinjured.
4. Plaintiff testified that he remained employed with Defendant-Employer in his supervisory capacity until approximately September 2008, when his job duties changed due to reorganization. After September 2008, Plaintiff was required to perform the physical duties once performed by his subordinates. According to Plaintiff, despite a reduction in workforce, the same work was expected to be performed in the hours assigned and therefore he had to work at a fast pace.
5. Plaintiff testified that his physical duties included moving tables and stacking chairs in the large dining area, before mopping the floors and vacuuming the carpets. In the dish room, Plaintiff was required to stack approximately 25 plastic plates and carry, load and set plates. In the pot sink area, Plaintiff was required to wash and scour large heavy pots before stacking them. In the flat pan sink, Plaintiff was required to wash and lift pans. Plaintiff testified that these duties involved overhead and extended reaching and balancing. Plaintiff generally worked from 3:00 p.m. to 10:00 p.m.
6. After being reassigned to work in general maintenance as a utility worker in September 2008, Plaintiff testified that he experienced weakening and soreness in his arms that became progressively symptomatic. *Page 5 
7. Sometime after 9:00 p.m., on February 6, 2009, while vacuuming and preparing to move a chair, Plaintiff testified that he experienced a sharp, painful, electric-type shock in his right arm. As no supervisor was present, Plaintiff returned home.
8. The following morning Plaintiff testified that he reported what had happened to John Eddings, one of his supervisors, and informed him that he would not be able to come to work due to the pain in his right shoulder. Plaintiff also spoke with Eric Sweede, another supervisor, and explained that he had injured his right shoulder at work and needed medical attention. At the hearing, Mr. Sweede testified that although Plaintiff did report that his right arm was bothering him and he was unable to report for work on February 7, 2009, Plaintiff did not report having sustained an injury at work.
9. On February 7, 2009, Plaintiff presented to Dr. Alvin Lue, his family doctor at PrimeCare, with complaints of right shoulder pain. Dr. Lue administered a steroid injection and referred Plaintiff for a physical therapy evaluation. Dr. Lue released Plaintiff from work.
10. For the next four to six weeks, Plaintiff commenced physical therapy to address his right shoulder pain and to minimize functional deficits. During this time, Plaintiff remained under the care of Dr. Lue, who continued to restrict Plaintiff from working.
11. On February 26, 2009, Plaintiff presented to Dr. Lauren Spillman, a preventive medicine specialist, who diagnosed Plaintiff with a shoulder/upper arm strain. Dr. Spillman opined that Plaintiff's pain was not related to a new work injury and she released him to return to regular duty. Plaintiff testified that Dr. Spillman did not examine him.
12. On March 11, 2009, an MRI was performed on Plaintiff's right shoulder, which revealed a recurrent full-thickness tear of the rotator cuff with approximately 3.3 cm of tendon retraction and associated atrophy of the supra and infraspinatus muscles. Upon review of the *Page 6 
MRI report, Dr. Lue continued to maintain Plaintiff's work restrictions and referred him to an orthopedist for further examination and treatment.
13. On March 30, 2009, Plaintiff presented to Dr. Michael E. King, the orthopedic surgeon who had performed Plaintiff's right rotator cuff repair in 2005. Plaintiff reported that he experienced sudden pain in his right shoulder while vacuuming on February 6, 2009. Dr. King examined Plaintiff, diagnosed a right shoulder rotator cuff tear and adhesive capsulitis in Plaintiff's right shoulder, and ultimately referred him for a surgical evaluation with Dr. David V. Janeway, an orthopedic surgeon.
14. On June 29, 2009, Plaintiff presented to Dr. David Janeway, who opined that Plaintiff suffered a recurrent chronic rotator cuff tear in his right shoulder and a probable biceps subluxation and labral tear in the right shoulder. Dr. Janeway recommended a right shoulder arthroscopy, biceps tenodesis, possible labral repair and rotator cuff repair, which he performed on August 5, 2009.
15. After his surgery, Plaintiff continued to complain of pain in his right shoulder. Dr. Janeway instructed Plaintiff to continue with physical therapy and remain out of work.
16. On February 22, 2010, Plaintiff presented to Dr. Janeway, who released him to regular duties with instructions to follow-up as needed.
17. On March 25, 2010, Plaintiff again presented to Dr. Janeway with complaints of throbbing, aching and constant pain, associated with tingling and weakness in his right arm. Plaintiff also reported pain in his neck.
18. On March 29, 2010, concerned with the increased symptoms in his right shoulder, Plaintiff presented to Dr. W. Stephen Furr, an orthopedic surgeon. Dr. Furr opined that a rotator *Page 7 
cuff injury could not be ruled out and recommended that Plaintiff undergo an MRI to diagnostically evaluate the shoulder.
19. On April 23, 2010, Plaintiff underwent an MRI of his right shoulder, which revealed a full thickness rotator cuff tear with contraction of the tendon and muscle belly, as well as AC joint degenerative changes and glenohumeral degenerative changes.
20. Dr. Furr opined that any further surgery on Plaintiff's shoulder would not be beneficial because although it may reduce the level of pain, it would not increase Plaintiff's range of motion or functionality of the arm.
21. With respect to whether Plaintiff was able to work, Dr. Furr opined that Plaintiff was experiencing a disabling and dysfunctional right shoulder. However, Dr. Furr did not opine that Plaintiff was incapable of work in any employment or that it would be futile for him to attempt to return to work.
22. In order to differentiate the symptoms related to Plaintiff's shoulder from those related to Plaintiff's neck, Dr. Furr recommended that an EMG be performed on Plaintiff's right upper extremity, as well as an MRI of the cervical spine.
23. The EMG revealed a C-7 radiculopathy and the cervical spine MRI revealed C-2 through C-7 degenerative changes, including disc protrusions, with varying degrees of stenosis. Dr. Furr opined that Plaintiff had cervical degenerative disk disease consistent with cervical stenosis with C-7 radiculopathy. Dr. Furr did not believe the radiculopathy was causing Plaintiff's right shoulder problems.
24. With regard to Plaintiff's cervical symptoms, Dr. Furr opined that Plaintiff may have strained the muscle or tissues in his neck while performing his work duties because he was compensating for the problem in his shoulder. However, Dr. Furr stated that Plaintiff's cervical *Page 8 
complaints are just as likely to be an incidental finding as they could be related to any type of trauma or work incident that occurred in February 2009. Dr. Furr opined that Plaintiff's degenerative disk disease and the right arm radiculopathy were not caused by his work duties but potentially could have been exacerbated by them.
25. Following the hearing before the Deputy Commissioner, depositions were taken of Dr. King, Dr. Janeway, and Dr. Furr. Each was asked their opinions on causation between the Plaintiff's employment and his injuries to his right shoulder and cervical spine.
26. Dr. King, the orthopedic surgeon who performed the rotator cuff repair on Plaintiff's right shoulder in 2005, noted that the tendons in Plaintiff's right shoulder were not in good condition even after the first surgery and that the chances of re-tearing the rotator cuff with his increased activities after September 2008 were significantly increased.
27. On the issue of whether Plaintiff suffered an injury to his right shoulder on February 6, 2009, Dr. King opined that there was a high correlation in the sudden, intense pain Plaintiff experienced while performing his work duties on February 6, 2009, and the recurrent rotator cuff tear that was subsequently diagnosed.
28. On the issues of contribution and increased risk, Dr. King opined that Plaintiff's job duties with Defendant-Employer were a significant aggravating factor in the development of the recurrent right shoulder condition and that Plaintiff was at an increased risk of developing his shoulder condition because of those job duties over the general population.
29. Dr. Janeway testified that Plaintiff's injury to his right shoulder could well have resulted from a traumatic injury or from repeated stressors over time. Dr. Janeway testified to a reasonable degree of medical certainty that Plaintiff's injury could contribute to, cause, or aggravate Plaintiff's right shoulder condition and that Plaintiff's job placed him at an increased *Page 9 
risk of contracting that injury over the general public. Dr. Janeway testified that he based his opinion of Plaintiff's employment creating an increased risk not only on his medical knowledge of the mechanics of Plaintiff's injury but also his personal experience of performing similar work duties while in college and having undergone bilateral shoulder surgeries as a result.
30. Dr. Furr, an orthopedic surgeon, testified that Plaintiff's work duties of vacuuming, lifting, pushing and pulling more likely than not exacerbated his right shoulder condition and that, as a result, Plaintiff was at an increased risk of contracting his right shoulder condition over the general population.
31. Dr. Furr testified that if Dr. Janeway had repaired the rotator cuff on August 5, 2009, then the tear occurred sometime between August 5, 2009 and the April 23, 2010 MRI.
32. Dr. Furr opined that Plaintiff's work activities after September 2008 more likely than not exacerbated his right shoulder condition culminating in the significant complaints of pain in February 2009, and resulting in the rotator cuff tear.
33. Dr. Furr also opined that Plaintiff's work duties placed him at an increased risk of suffering his right shoulder condition, when compared to members of the general public or employees in general not equally exposed.
34. The Full Commission finds Plaintiff's testimony concerning the nature and extent of his right shoulder condition and the history of injury to be credible. At the hearing before the Deputy Commissioner, Plaintiff testified that he was not taking any pain medication during the 6 to 12 months prior to his injury on February 6, 2009; however, afterward he commenced pain medication, including Oxycodone, for his right shoulder pain.
35. The Full Commission finds that once Plaintiff was no longer in a supervisory capacity, his right shoulder was subject to additional stress due to the nature and extent of the *Page 10 
additional duties he was then required to perform. Plaintiff's arm became increasingly symptomatic in approximately November 2008 and while vacuuming on February 6, 2009, he experienced a material aggravation or exacerbation of his previously injured right shoulder.
36. In the alternative, based on the greater weight of the evidence, the Full Commission finds that Plaintiff's job duties as a utility worker for Defendant-Employer, requiring repeated overhead lifting, extending, pushing and pulling and repetitive right arm movements placed him at an increased risk for the development of his right shoulder condition and that Plaintiff's job duties more likely than not were significant causal factors of Plaintiff's right shoulder symptoms.
37. As for Plaintiff's employment status, Plaintiff has not returned to work with Defendant-Employer since February 6, 2009. Plaintiff testified that he has been unable to return to his job with Defendant-Employer due to the condition of his right shoulder.
38. Dr. King testified that after Plaintiff's rotator cuff repair surgery in 2005, his instructions to Plaintiff were to perform clerical or managerial work and not to attempt repetitive labor or any type of heavy labor with the shoulder, as the quality of the tissue of the rotator cuff was poor. As such, the Full Commission finds that Plaintiff's job duties after September 2008, as a utility worker for Defendant-Employer were no longer suitable based on Dr. King's restrictions; nonetheless, Plaintiff continued to work for Defendant-Employer until February 6, 2009.
39. Although Dr. Furr opined that Plaintiff experienced a disabling and dysfunctional right shoulder, there was no evidence to indicate whether he or any other medical provider opined Plaintiff was incapable of work in any employment, whether Plaintiff was capable of some employment or whether it would be futile for Plaintiff to attempt to seek employment. The Full *Page 11 
Commission finds the testimony of Dr. Furr insufficient to find Plaintiff incapable of work in any employment or that it would be futile for him to even attempt to look for work.
40. There was no evidence introduced regarding efforts that Plaintiff had made to secure employment after February 6, 2009, other than he was a pastor for a very small congregation and received a "love" offering of $100.00 per week for his services.
41. On February 22, 2010, Dr. Janeway released Plaintiff to regular duty after his right shoulder surgery. There was insufficient evidence of record upon which to find that after this date, Plaintiff was incapable of work in any employment, capable of some work but that he had, after a reasonable effort, been unsuccessful in obtaining employment or that Plaintiff was capable of some work but because of pre-existing conditions, i.e., age, inexperience, or lack of education, it would be futile for him to seek other employment.
42. Based on the totality of the evidence, including medical and lay testimony, the Full Commission finds that Plaintiff was unable to earn wages in any competitive employment due to his right shoulder condition from February 6, 2009, through February 22, 2010, the date that Dr. Janeway released Plaintiff to return to work after his shoulder surgery.
43. The treatment for Plaintiff's right shoulder by Dr. David Janeway, Dr. W. Stephen Furr and the rotator cuff surgery, provided by Dr. Michael E. King was reasonably necessary to effect a cure or provide relief for Plaintiff's right shoulder condition that he suffered as a result of his work duties.
44. The Full Commission finds by the greater weight of the medical evidence that there is a substantial risk that Plaintiff will need future medical treatment for his right shoulder. *Page 12 
45. There was insufficient evidence of record to determine if Plaintiff has reached maximum medical improvement and whether he is entitled to any permanent partial disability rating.
46. The evidence of record was insufficient to find by its greater weight that Plaintiff's cervical condition is related to or was aggravated by his work duties with Defendant-Employer.
47. Defendants' defense of this claim does not amount to stubborn, unfounded litigiousness.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 18, 2005, Plaintiff sustained an admittedly compensable injury by accident to his right shoulder, arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. On February 6, 2009, Plaintiff sustained a substantial aggravation or exacerbation of Plaintiff's right shoulder condition, arising out of and in the course of his employment with Defendant-Employer. Mills v. City of New Bern,122 N.C. App. 283, 468 S.E.2d. 587 (1996); Walston v. BurlingtonIndus., 49 N.C. App. 301, 304, 271 S.E.2d 516, 518 (1980);Pruitt v. Knight Publ'g Co.,27 N.C. App. 254, 218 S.E.2d 876 (1975).
3. In the alternative, Plaintiff has established by the greater weight of the evidence that as a result of his employment with Defendant-Employer, he developed his right shoulder symptoms. N.C. Gen. Stat. § 97-53(13). The opinion testimony of the medical experts is sufficient to meet Plaintiff's burden of proving that his employment duties placed him at greater *Page 13 
risk for contracting this condition and that his employment duties, more likely than not, caused the development of these conditions.Rutledge v. Tultex Corp./King's Yarn,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).
4. Disability refers to the impairment of the injured employee's earning capacity because of the work injury. N.C. Gen. Stat. § 97-2(9) (2009); Peoples v. Cone MillsCorp., 316 N.C. 426, 432, 342 S.E.2d 798, 804 (1986). Upon a full duty release without restrictions, a claimant is no longer entitled to total disability benefits under N.C. Gen. Stat. § 97-29.Harrington v. Adams-Robinson Enterprises,349 N.C. 218, 504 S.E.2d 786 (1998).
5. Plaintiff failed to meet his burden of proof in establishing that he was still disabled or entitled to total disability benefits following his full duty release by Dr. Janeway on February 22, 2010. A fundamental tenant of North Carolina worker's compensation law is that the employee has the burden of proving both the existence and extent of his disability. Clark v. Wal-Mart,360 N.C. 41, 43, 619 S.E. 2d 491, 493 (2005). A claimant can satisfy his burden of proof in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in obtaining employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other *Page 14 
employment at a wage less than that earned prior to the injury.Russell v. Lowes Prod. Distribution,108 N.C. App. 762, 765, 425 S.E.2d 454,457 (1993) (internal citations omitted). Plaintiff presented insufficient evidence to prove disability under any of the four prongs of Russell. The evidence revealed that Plaintiff received a full duty work release, did not participate in a job search following that release, and offered insufficient evidence to suggest that it would be futile for him to search for employment. Because Plaintiff has not met his burden of proving disability, Plaintiff is not entitled to on-going total disability benefits after February 22, 2010. Id.
6. As a direct and proximate result of Plaintiff's compensable injury by accident on February 6, 2009, or occupational disease, Plaintiff has been unable to earn the same or greater wages as he was earning in the same or any other employment until he was released by Dr. Janeway on February 22, 2010. As a result, Plaintiff is entitled to receive ongoing temporary total disability compensation at the rate of $409.27 per week, commencing February 6, 2009, through February 22, 2010. N.C. Gen. Stat. § 97-29.
7. As a direct and proximate result of Plaintiff's compensable injury by accident on February 6, 2009, or occupational disease, Plaintiff is entitled to all medical expenses incurred or to be incurred for his right shoulder for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen Plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25.
8. There is a substantial risk that plaintiff will need future medical treatment for his right shoulder. N.C. Gen. Stat. § 97-25.1.
9. Defendants' defense of this claim does not amount to stubborn, unfounded litigiousness. Thus, Plaintiff is not entitled to an award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. *Page 15 Sparks v. Mountain Breeze Restaurant,55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Subject to an attorney's fee hereinafter approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $409.27 per week commencing February 6, 2009, and continuing through February 22, 2010, the date that Dr. Janeway released Plaintiff to return to his regular duties.
2. Defendants shall pay all past and future medical expenses incurred or to be incurred as a result of Plaintiff's compensable injury by accident and occupational disease to his right shoulder, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen Plaintiff's period of disability.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation due Plaintiff under Paragraph One of this Award is approved for Plaintiff's counsel and shall be paid by Defendants as follows: twenty-five percent (25%) of the compensation which has accrued shall be paid directly to Plaintiff's counsel.
4. Defendants shall pay the costs.
This the 20th day of July, 2011.
 S/_________________
 CHRISTOPHER SCOTT
 COMMISSIONER
CONCURRING:
S/__________________ STACI T. MEYER COMMISSIONER
S/_____________________ DANNY LEE McDONALD COMMISSIONER *Page 1